## IN THE COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO

| | |
|---|---|
| **TOTAL QUALITY LOGISTICS, LLC,** : | |
| 4289 Ivy Pointe Boulevard, : | Case No.: _____ |
| Cincinnati, Ohio 45245, : | |
| : | Judge: _____ |
| **Plaintiff,** : | |
| : | |
| **v.** : | |
| : | **COMPLAINT** |
| **CORNELIUS  LEASING  SYSTEMS,** : | |
| **INC.,** : | (JURY TRIAL DEMANDED) |
| c/o Ronald G. Cornelius, Registered Agent : | |
| 1600 East 6th Street, : | |
| La Junta, Colorado 81050, : | |
| : | |
| **and** : | |
| : | |
| **MAISON TRANSPORT, LLC,** : | |
| 23846 State Highway 71, : | |
| Rocky Ford, Colorado 81067, : | |
| : | |
| **Please also serve at:** : | |
| **MAISON TRANSPORT, LLC,** : | |
| c/o U.S. Corporation Agents, Inc., : | |
| Registered Agent : | |
| 121 South Tejon Street, Suite 900, : | |
| Colorado Springs, Colorado 80903 : | |
| : | |
| **Defendants.** : | |

For its Complaint (the "Complaint") against Defendants Cornelius Leasing Systems, Inc.

and Maison Transport, LLC, Plaintiff Total Quality Logistics, LLC, states as follows:

### Introduction

1.      This action arises from Defendants' wrongful and illegal procurement and use of

Plaintiff's trade secrets and confidential information.



2.     Plaintiff is a third-party logistics company that provides freight-brokerage services. Defendants are freight carriers that, like Plaintiff, assist their customers with hauling freight. Thus, Plaintiff and Defendants are direct competitors.

3.     Through their mutual employee/agent, and as part of a conspiracy involving one of Plaintiff's ex-employees, Defendants obtained Plaintiff's trade secrets and confidential information pertaining to its customers and rates that it was willing to pay other companies to haul freight.

4.     Defendants used these trade secrets and confidential information to solicit Plaintiff's customers and to obtain business from Plaintiff at the highest rates possible. These acts have resulted in unfair competition, as well as severe damage to Plaintiff.

5.     This action seeks damages for Defendants' intentional and blatant misuse of Plaintiff's trade secrets and confidential information, including compensatory damages, punitive damages, and attorney's fees.

### Parties, Jurisdiction, and Venue

6.     Plaintiff Total Quality Logistics, LLC ("TQL") is an Ohio limited liability company with its principal place of business at the above-captioned address. TQL is a federally registered freight broker that provides third-party logistics services to its customers.

7.     Upon information and belief, Defendant Cornelius Leasing Systems, Inc. ("Cornelius Leasing") is a Colorado corporation with its principal place of business at the above-captioned address. Cornelius Leasing is a federally registered freight carrier.

8.     Upon information and belief, Defendant Maison Transport, LLC ("Maison," and, together with Cornelius Leasing, "Defendants") is a Colorado limited liability company with its

2

principal place of business at the above-captioned address. Maison is a federally registered freight carrier.

9.      This Court has original subject matter jurisdiction over the claims raised in the Complaint.

10.     This Court has personal jurisdiction over Cornelius Leasing because, among other reasons, Cornelius Leasing contractually submitted to this Court's jurisdiction, transacted business in Ohio, and caused tortious injury directed at an Ohio company.

11.     This Court has personal jurisdiction over Maison because, among other reasons, Maison transacted business in Ohio and caused tortious injury directed at an Ohio company.

12.     Venue is proper in this Court because, among other reasons, Hamilton County is the location of the activity that gave rise to TQL's claims for relief, and because both Defendants transacted business in Hamilton County. Further, venue is proper in this Court because Cornelius Leasing contractually submitted to Hamilton County as the exclusive venue for any disputes arising out of its contract with TQL.

## **Factual Background**

A .     *The eN aeof TQ LsB uies*

13.     TQL is a third-party logistics company that provides freight brokerage and other logistics services to its customers.

14.     TQL's customers are companies that want to ship goods from one location to another. These customers include companies that want to ship their own goods. But many of TQL's customers are freight brokers that have already agreed to ship goods on behalf of another customer.

3

15.   TQL does not own, operate, or lease any of its own trucks or trucking equipment. Nor does it employ any drivers to haul freight.   Instead, TQL engages and coordinates independent carriers that are able and willing to haul freight at the times and places needed by TQL's customers.

16.   Per TQL's standard procedure, before TQL will retain a broker or carrier to ship freight on its behalf, they must execute a standard broker/carrier agreement.   By doing so, these brokers and carriers agree to certain standard terms and conditions that govern their relationship with TQL going forward.

*B .   Cornelius Leasing's Broker/Carrier Agreement with TQL*

17.   In October 2006, Cornelius Leasing executed and delivered to TQL a Broker/Carrier Agreement (the "Carrier Agreement").   An accurate copy of the Agreement is attached as Exhibit A, which is incorporated by reference.

18.   The Carrier Agreement sets forth the terms and conditions that govern Cornelius Leasing's agreement to provide services to TQL, and TQL's agreement to use and pay for those services as needed.

19.   Under the Carrier Agreement, Cornelius Leasing agreed to treat all of TQL's customers as TQL's accounts, and not to solicit or to provide transportation services directly to those customers. *See* Carrier Agreement, at § 11. Cornelius Leasing agreed to do so during the term of the Carrier Agreement, as well as for a period of 18 months following its termination. *See* Carrier Agreement, at § 11.

20.   Further, the Carrier Agreement provides that neither party will disclose or use for any reason the other party's confidential information, including, but not limited to, information

4

pertaining to freight and brokerage rates, freight charges paid or collected, or customer logistics requirements and preferences. *Se* Carrier Agreement, at § 22.

21. Under the Carrier Agreement, both parties agreed to follow a specified procedure for resolving disputes that arise under the Carrier Agreement. *Se* Carrier Agreement, at § 16. However, the parties agreed that, "[f]or disputes whose amount in controversy exceeds $10,000[,] the Parties will seek litigation." *Se* Carrier Agreement, at § 16(d).

22. With respect to any lawsuit filed under the Carrier Agreement, the Carrier Agreement provides that the "exclusive venue for any lawsuit . . . shall be in state or federal court in Cincinnati, Hamilton County, Ohio," and that the Carrier Agreement "shall be governed by and construed in accordance with the laws of the State of Ohio." *Se* Carrier Agreement, at § 15.

23. Further, for any dispute arising under the Carrier Agreement that proceeds to litigation, it provides that "[Cornelius Leasing] agrees to pay all reasonable expenses, attorney fees and costs (including court costs) that [TQL] incurs in any such litigation." *Se* Carrier Agreement, at § 16.

C. *TQ L sE xE m pbeL a ls C onfiliatl I nfom ditnh eD  dindi rl4  g ent*

24. The events that gave rise to this action involve the wrongful acts of two individuals, Eric Love ("Love") and Shane Moore ("Moore").

25. Love is a former employee of TQL, who worked as a freight broker at one of TQL's offices in Hamilton County, Ohio.

26. Moore is a freight broker who regularly conducts business in the State of Ohio, and, until recently, conducted business with TQL.

5

27.     While Love still worked for TQL, Moore frequently contacted him to request that Love arrange for a truck to transport a freight load for Moore's customers.  In accordance with standard procedure, after the requested freight services were provided, Moore would bill his customer, then he would pay TQL through one of the multiple companies with which Moore was—and still is—affiliated, non-party Kansas Continental Express, Inc. ("Kansas").

28.     It seems that this relationship between Love and Moore began as legitimate and mutually beneficial business dealings between two freight brokers.  At some point, however, it turned into a conspiracy by which Moore and Love agreed that Love would disclose TQL's trade secrets and confidential information to Moore, who would then use and misappropriate them to the benefit of himself and the companies with which he was affiliated and Love, but to the detriment of TQL.

29.     Starting around February 2015, without TQL's knowledge, permission, or authorization, Love began providing Moore with TQL's trade secrets and confidential information about a number of TQL customers (the "Customers").  This information included, but was not limited to, the price(s) TQL was charging the Customers, the profit margin for each route, and the amounts TQL was paying other brokers or carriers to transport the Customers' loads.

30.     Love had not provided services to or otherwise developed any relationship with these Customers about which he was disclosing trade secrets and confidential information.  Instead, these Customers were serviced by other brokers at TQL.

31.     Next, Moore would contact these Customers and offer to transport their freight at prices that were lower than TQL's then-current offer.  That is, Moore used these trade secrets

6

and confidential information, which he wrongfully obtained from Love, to underbid TQL and to retain business from the Customers.

32.     As a result of these actions, one or more of the Customers ceased or limited doing business with TQL, and, further, began using Moore for their shipping and logistics needs.

33.     In some situations, after he wrongfully used TQL's trade secrets and confidential information to obtain business from one of the Customers, Moore would retain TQL to arrange some or all of the freight shipment. Because Moore was already charging the Customer a lower price than TQL's then-current bid to each Customer, however, TQL received less compensation than it would have received had TQL been the direct broker for the load. That is, Moore's conduct resulted in TQL receiving less compensation for performing the same work.

34.     In addition to providing TQL's confidential customer information, Moore solicited and Love provided Moore with TQL's trade secrets and confidential information pertaining to the rates that it had paid—or was willing to pay—to carriers to transport freight on certain routes (the "Rates").

35.     Moore was able to use his knowledge of these Rates when negotiating with TQL freight brokers to secure business from TQL for carriers with which he was affiliated, and to do so at the maximum possible compensation, all of which was to TQL's detriment.

36.     Pursuant to this scheme, Love and Moore agreed to divide between themselves any commissions earned on freight loads that Moore brokered using trade secrets and confidential information pertaining to the Rates or the Customers.

D.     Conduct Leading and May Be A Part of Them Through the Unlawful Scheme

37.     The tacit conspiracy between Love and Moore already forms the basis for a separate legal action, *Total Quality Logistics, LLC v. Eric Love et al*         , which is currently pending

7

as Case No. 2015-CVH-01223 in the Clermont County Court of Common Pleas, Clermont County, Ohio (the "Love Litigation"). Love and Moore are currently named defendants in the Love Litigation, as is Kansas.

38. When it filed the Love Litigation, TQL believed that the only company with which Moore was affiliated as a freight broker was Kansas.

39. During the discovery phase of the Love Litigation, however, TQL learned that, in addition to Kansas, Moore is—and at all relevant times was—an owner, employee, agent, and/or affiliate of a number of freight carriers located across the country.

40. Moore is the sole owner and member of Maison.

41. Further, Moore is an employee/agent of Cornelius Leasing, which is a company that is owned by Moore's step-father, non-party Ronald G. Cornelius ("Cornelius").

42. During Moore's deposition in the Love Litigation, he admitted to his affiliation with each of these companies.

43. Further, also during Moore's deposition in the Love Litigation, Moore admitted that he regularly scheduled freight loads to be hauled by Cornelius Leasing or Maison during the pertinent timeframe.

44. Because Moore was using Cornelius Leasing and Maison to haul freight loads during the time he was improperly receiving TQL's trade secrets and confidential information from Love pertaining to the Customers, upon information and belief, Cornelius Leasing and Maison were able to secure business by underbidding TQL to haul freight for the Customers.

45. Further, because Moore obtained TQL's trade secrets and confidential information pertaining to the Rates, Cornelius Leasing and Maison were able to maximize the compensation they received on any freight loads they hauled for TQL.

8

46.     In other words, Moore used TQL's trade secrets and confidential information to benefit Cornelius Leasing and Maison to TQL's detriment.

47.     And at all times relevant to this action, Moore was an express agent of Cornelius Leasing and Maison.

### Count One – Breach of Contract
### (Asserted Against Cornelius Leasing)

48.     TQL incorporates all preceding allegations contained in this Complaint as if they were fully restated herein.

49.     The Carrier Agreement is a binding and enforceable contract between TQL and Cornelius Leasing.

50.     Under the Carrier Agreement, Cornelius Leasing agreed to treat all of TQL's customers as TQL's accounts, and not to solicit or to provide transportation services directly to those customers. *Se* Carrier Agreement, at § 11.

51.     Further, under the Carrier Agreement, Cornelius Leasing is prohibited from disclosing or using for any reason TQL's confidential information, including, but not limited to, information pertaining to freight and brokerage rates, freight charges paid or collected, or customer logistics requirements and preferences. *Se* Carrier Agreement, at § 22.

52.     Cornelius Leasing has breached the terms of the Carrier Agreement by, among other things, (1) soliciting and/or providing transportation services to the Customers, and (2) using TQL's confidential information for its benefit and to TQL's detriment.

53.     Under the Carrier Agreement, TQL is entitled to its reasonable expenses, attorney's fees, and costs incurred in this litigation, which TQL brings as a result of Cornelius Leasing's breach of the Carrier Agreement.

9

54.     As a direct and proximate result of Cornelius Leasing's breach of the Carrier Agreement, TQL has suffered damages in an amount in excess of $25,000, plus attorney's fees, court costs, prejudgment interest, and post-judgment interest.

### Count Two – Misappropriation of Trade Secrets
### (Asserted Against Both Defendants)

55.     TQL incorporates all preceding allegations contained in this Complaint as if they were fully restated herein.

56.     Information pertaining to the TQL Customers and Rates constitutes protected trade secrets under Ohio's Uniform Trade Secrets Act, R.C. § 1333.61 *et.*     , because it derives independent economic value from not being generally known to and not being readily ascertainable by other persons who can obtain economic value from its disclosure or use, such as TQL's competitors.  Further, TQL has taken reasonable efforts to maintain the secrecy of these trade secrets.

57.     TQL has expended substantial resources over the course of many years to create and to protect the highly confidential information necessary to build and to maintain its business so that it can compete nationally with other freight brokers and carriers.

58.     Defendants have misappropriated and used these trade secrets to undercut TQL's bids to the Customers, and to obtain business from TQL at the maximum possible rate.

59.     Defendants are liable for acts that include, but are not limited to, those committed by their express agent, Moore.

60.     As a direct and proximate result of Defendants' misappropriation of TQL's trade secrets, TQL has suffered damages in an amount in excess of $25,000, plus attorney's fees, court costs, and punitive damages, as provided by applicable law, plus pre- and post-judgment interest.

10

### Count Three – Tortious Interference with a Contract
### (Asserted Against Both Defendants)

61.     TQL incorporates all preceding allegations contained in this Complaint as if they were fully restated herein.

62.     During his employment at TQL, Love was subject to a binding and enforceable contract that, among other things, prohibited Love from competing with TQL or disclosing TQL's confidential information (the "Love Agreement").

63.     Moore was aware of the existence of the Love Agreement.

64.     Defendants were aware of the existence of the Love Agreement, at the very least, by virtue of the imputed knowledge of their express agent, Moore.

65.     Defendants intentionally procured Love's breach of the Love Agreement by procuring TQL's trade secrets and confidential information from Love.

66.     Defendants have no legal justification for intentionally causing Love to breach his contract with TQL.

67.     Therefore, Defendants have tortiously interfered with the Love Agreement.

68.     As a direct and proximate result of Defendants' tortious interference with the Love Agreement, TQL has suffered damages in an amount in excess of $25,000, plus attorney's fees, court costs, punitive damages, and pre- and post-judgment interest.

### Count Four – Tortious Interference with a Business Interest
### (Asserted Against Both Defendants)

69.     TQL incorporates all preceding allegations contained in this Complaint as if they were fully restated herein.

70.     Love disclosed to Moore TQL's trade secrets and confidential information pertaining to the Customers.

11

71.     At the time this information was disclosed, Moore, as well as the Defendants, were aware that TQL had preexisting business relationships with these Customers.

72.     Through the actions of Moore and others, Defendants used their knowledge of TQL's trade secrets and confidential information to solicit business from these Customers, constituting intentional interference with TQL's business relationships with the Customers.

73.     In many instances, Defendants' solicitations resulted in Defendants being engaged to haul certain freight for the Customers instead of TQL; in some cases, these solicitations resulted in the Customers ceasing to conduct business with TQL entirely.

74.     Defendants have no legal justification for intentionally interfering with TQL's business relationships with the Customers.

75.     Therefore, Defendants have tortiously interfered with these business relationships.

76.     As a direct and proximate result of Defendants' tortious interference with these business interests, TQL has suffered damages in an amount in excess of $25,000, plus attorney's fees, court costs, punitive damages, and pre- and post-judgment interest.

### Count Five – Civil Conspiracy
#### (Asserted Against Both Defendants)

77.     TQL incorporates all preceding allegations contained in this Complaint as if they were fully restated herein.

78.     The Defendants acted in combination with one another, with a willful and malicious intent, to wrongfully and unlawfully damage TQL. This includes, but is not limited to, Defendants' use of TQL's trade secrets and confidential information pertaining to the Customers and the Rates.

79.     Both of the Defendants participated in these wrongful acts, and rendered assistance to the other in doing so.

12

80.    As a direct and proximate result of Defendants' civil conspiracy, TQL has suffered damages in an amount in excess of $25,000, plus attorney's fees, court costs, punitive damages, and pre- and post-judgment interest.

**Count Six – Unjust Enrichment**
**(Asserted Against Both Defendants)**

81.    TQL incorporates all preceding allegations contained in this Complaint as if they were fully restated herein.

82.    Defendants wrongfully and illegally benefitted from their use of TQL's trade secrets and confidential information, including information pertaining to the Customers and the Rates.

83.    The fact that Defendants have benefitted from this wrongful and illegal behavior to TQL's detriment is unjust.

84.    As a direct and proximate result of Defendants' wrongful acts, TQL has suffered damages in an amount in excess of $25,000, plus court costs, prejudgment interest, and post-judgment interest.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Total Quality Logistics, LLC requests that this Court issue a judgment as follows:

a.    On Count One, award compensatory damages in favor of TQL and against Cornelius Leasing in an amount to be determined at trial in excess of $25,000, plus attorney's fees, court costs, prejudgment interest, and post-judgment interest;

b.    On Count Two, award compensatory damages in favor of TQL and against both Defendants, jointly and severally, in an amount to be determined at trial in excess

13

of $25,000, plus attorney's fees, court costs, punitive damages, prejudgment interest, and post-judgment interest;

c.   On Count Three, award compensatory damages in favor of TQL and against both Defendants, jointly and severally, in an amount to be determined at trial in excess of $25,000, plus attorney's fees, court costs, punitive damages, prejudgment interest, and post-judgment interest;

d.   On Count Four, award compensatory damages in favor of TQL and against both Defendants, jointly and severally, in an amount to be determined at trial in excess of $25,000, plus attorney's fees, court costs, punitive damages, prejudgment interest, and post-judgment interest;

e.   On Count Five, award compensatory damages in favor of TQL and against both Defendants, jointly and severally, in an amount to be determined at trial in excess of $25,000, plus attorney's fees, court costs, punitive damages, prejudgment interest, and post-judgment interest;

f.   On Count Six, award compensatory damages in favor of TQL and against Defendants, jointly and severally, in an amount to be determined at trial in excess of $25,000, plus court costs, prejudgment interest, and post-judgment interest;

g.   Award TQL its costs and reasonable attorney's fees incurred in litigating this action; and

h.   Award TQL any other relief to which it is entitled at law or in equity.

14

Respectfully Submitted,

_/s/ Ryan S. Lett_
Ryan S. Lett (0088381)
rlett@fbtlaw.com
Benjamin J. Helwig (0079184)
bhelwig@fbtlaw.com
FROST BROWN TODD LLC
3300 Great American Tower
301 E. Fourth Street
Cincinnati, OH 45202
Tel. (513) 651-6800
Fax (513) 651-6981

_Trial Attorneys for Total Quality Logistics LLC_

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

_/s/ Ryan S. Lett_
Ryan S. Lett (0088381)

0124324.0594664  4827-8751-9040v2

15

# EXHIBIT A

From: 719.384.8468    Page: 1/9    Date: 10/31/2006 3:34:47 PM



## Rate Confirmation

P.O. BOX 799 MILFORD, OHIO 45150
PHONE 800-580-3101 OR 513-831-2600 FAX 513-965-7831
www.TotalQualityLogistics.com

**TOTAL QUALITY LOGISTICS**
exceptional service, proven results



335270CAR1000

TQL PO #: **335270**                                    Trailer: **Van Or Reefer**      10/31/2006 3:21:13 PM
Rep: Kevin Stachowski Ext: 1893                 Size: **48 ft or 53 ft**    Temperature:
Pickup Up Date(s): **11/02**                        Delivery Date(s): **11/03**
Carrier: **Cornelius Leasing Systems Inc (co)**    Driver: **??**
Rate (To The Truck):    **$1000.00**    (FLAT $1000.00 x 1 = $1000.00 )
  (Rates that are based upon weight or count will be calculated from the quantities loaded.)
Carrier Is Responsible For   None Unloading Charges
Comments:
Carrier  Is Not Responsible For Pallet Exchange

| Pick Ups | City | State | | | Date | Time |
|---|---|---|---|---|---|---|
| | EMPORIA | KS | | | 11/2/2006 | 1000 appt per Charlotte |

| Deliveries | City | | State | Date | Time |
|---|---|---|---|---|---|
| | DENVER | | CO | 11/3/2006 | 2000 appt per Jan |

1. Drivers are required to check call every day (including Sat., Sun., and holidays), between 8:00am and 9:00am Eastern
   Time. Failure to do so can result in a $100.00 fine against carrier's settlement for each infraction.
2. Carrier is responsible for any damage to product or damage to the products container, and shortages of freight.
3. If any unloading payment is agreed upon, **carrier must supply unloading receipt** with lumpers full name and social
   security number at time of original billing, also, the driver must call TQL to get a release number for any lumper fees.
   Failure to do so within 24 hours of delivery will result in no-reimbursement for unloading.
4. TQL is available 24 hours a day 7 days a week. Failure to call immediately on any problems can result in a $200.00 fine.
5. To ensure prompt payment, we **require the ORIGINAL** signed shippers BOL's, along with TQL's P.O.# on the invoice.
6. Failure to return with fully loaded truck or incomplete order will result in a reduced pro-rated fee.
7. Any costs incurred by TQL due to your truck being late for pick-up or delivery appointments could be charged to carrier.
8. $25 will be deducted from your invoice for **each** comcheck issued. We offer a 7 day (from date of receipt) quickpay
   at a 3% deduction from the gross amount of your rate. 7 Day Quickpay must be specified on your invoice. Also, a 1 day (from date of
   receipt)
   comcheck payment in full is available for a 5% discount plus a $25 processing fee for each load.
   1 Day Quickpay must be clearly specified on your invoice.
9. Failure to report any overage, shortage or damage within 24 hours will result in a $100 fine.
10. Any product that is to be disposed needs to have written consent from TQL before being disposed of.
11. Carrier agrees that broker is the sole party responsible for payment of carriers invoices and that, under no circumstance,
    will Carrier seek payment from the shipper or consignee.
12. Driver must have a minimum of 2 load locks to secure the load.
13. By executing this Rate Confirmation on behalf of Carrier, Driver hereby covenants and agrees that he/she has enough
    available hours of service to pick up and complete delivery of the tendered load within time frames dictated by BROKER
    and/or its CUSTOMER(S), without violating the FMCSA hours of service regulations contained at 49 C.F.R. § 395.
14. Carrier agrees that they are in compliance with safety regulations according to Federal, State and Local requirements.
15. Loads that are sealed at the shipping point are to remain sealed until an authorized person at the receiver breaks the seal.
    If the seal is broken by an unauthorized person, the carrier becomes 100% liable for the cost of the product and any other expenses.
16. TQL reserves the right to offset any claim(s) with pending invoices.
17. Carriers requesting fuel advances are subject to these terms: Com Checks will be issued after loading has been verified by shipping
    personnel. Carrier may be issued advances up to 40% of agreed upon rate, with a maximum of $1,400.
**REEFER LOADS**
1. Prior to loading, confirm that the reefer unit is working properly and pre-cool your trailer.
2. Driver is responsible to make sure space is provided for air circulation in front, rear, top, bottom, and between the load.
3. Trailers hauling produce must have an air chute for proper circulation, no exceptions! It is your drivers
   responsibility to make sure the chute is not damaged, obstructed or blocked in any way.
4. Check pulp temperature of the product to ensure that it has been pre-cooled. Do not accept any fresh product pulping
   over 2 degrees above the required temperature noted on our rate confirmation. If the temperature on our rate

This fax was sent with GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

From: 719 384 8468    Page: 2/9    Date: 10/31/2008 3:34:47 PM

confirmation differs from that on the Bill of Lading, call our office before signing the bills at the shipper. Make sure the pulp temp. of the product loaded is marked on the original Bill of Lading and that your driver agrees with that temp.
5. When a driver signs the Bill of Lading, you are confirming that you received the correct product, correct count, at the proper temperature. Be sure they agree with the information on the Bill of Lading. Your company is responsible.
6. Maintain continuous temperature noted on our Rate Confirmation in-route, unless otherwise instructed by our office.

TQL REPRESENTATIVE SIGNATURE
Kevin Stachowski

CARRIER REPRESENTATIVE SIGNATURE

*IMMEDIATELY FAX A COPY OF THIS SIGNED CONFIRMATION TO 513-965-7831 -THANK YOU

TQL PO#: 335270

This fax was sent with GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

From: 719 384 8468     Page: 3/9     Date: 10/31/2006 3:34:48 PM

*Rev 09/07/06*

*10/23/2006   OH CARRIER PACKET 5~*

**TOTAL QUALITY LOGISTICS**
Exceptional service, Proven results

**Mailing Address:**
P.O. Box 799, Milford, OH 45150-0799

**Overnight Address:**
1701 Edison Dr, Milford, OH 45150-2728

---

## BROKER/CARRIER AGREEMENT

THIS AGREEMENT ("Agreement"), is made and intended to be effective this _24th_ day of _Oct._, 20_66_ by and between Total Quality Logistics, Inc., an Ohio corporation and Total Quality Logistics, LLC, an Ohio Limited Liability Company whose main office is located in Milford, Ohio ("BROKER") and _Corwe linj Lews,in_ whose main office is located at _La Junta, Co   81050_, ("CARRIER"), collectively the "Parties."

### RECITALS

WHEREAS, BROKER is licensed by the Federal Motor Carrier Safety Administration in Docket No. MC-322572 B to engage in operations, in interstate or foreign commerce, as a broker, arranging for transportation of freight (except household goods), and as a broker arranges services for various consignors, consignees, motor carriers and/or other third parties (hereinafter individually or collectively "CUSTOMER(S)");

WHEREAS, CARRIER holds motor carrier operating authority from the Federal Highway Administration in Certificate No. MC-_268 904_ and, or, Permit/Certificate No. DOT-_535 995_ to engage in transportation as a common or contract carrier of property (except household goods, and class A and B explosives) under contracts with shippers and receivers and/or brokers of general commodities, and shall transport said property under its own operating authority and subject to the terms of this Agreement, and makes the representations herein for the purpose of inducing BROKER to enter into this agreement;

WHEREAS, BROKER, to satisfy some of the freight transportation needs of its CUSTOMERS, desires to use the services of CARRIER on a non-exclusive basis.

NOW, THEREFORE, for good and valuable consideration, the Parties agree as follows:

### AGREEMENT

1. **TERM.** The term of this Agreement shall be one (1) year, commencing on the date first mentioned above. This Agreement shall automatically renew itself for successive one year periods. Not withstanding the foregoing, either Party may terminate this Agreement on 30 days prior written notice, at any time, to the other Party, with or without cause, or as otherwise provided in this Agreement.

2. **CARRIER'S COVENANTS.** In performing transportation services hereunder, CARRIER agrees that it shall, at all times and at its own expense, provide and maintain:

   (a) driver(s) with enough available hours of service to pick up and complete delivery of the tendered load(s) within time frame(s) requested by BROKER and/or its CUSTOMER(s), without violating the FMCSA hours of service regulations contained at 49 C.F.R. § 395;

   (b) compliance during the term of this Agreement, with all applicable federal, state and local laws relating to the provision of its services including, but not limited to: transportation of Hazardous Materials, (including the licensing and training of drivers), as defined in 49 C.F.R. § 172.800, § 173, and § 397 et seq. to the extent that any shipments hereunder constitute Hazardous Materials; security regulations; owner/operator lease regulations; loading and securement of freight regulations; implementation and maintenance of driver safety regulations including, but not limited to, hiring, controlled substances, and hours of service regulations; sanitation, temperature, and contamination requirements for transporting food, perishable, and other products, qualification and licensing and training of drivers; implementation and maintenance of equipment safety regulations; maintenance and control of the means and method of transportation including, but not limited to, performance of its drivers.

   (c) CARRIER will notify BROKER immediately if its federal Operating Authority is revoked, suspended or rendered inactive for any reason; and/or if it is sold, or if there is a change in control of ownership, and/or any insurance required hereunder is threatened to be or is terminated, cancelled, suspended, or revoked for any reason.

3. **BROKER'S COVENANTS.** BROKER warrants that it has authority to tender its CUSTOMERS' freight for transportation under this Agreement. BROKER is not restricted from tendering freight to other carriers; CARRIER is not restricted from performing transportation for parties other than BROKER.



CONTRACT PAGE 1

*WWW.TOTALQUALITYLOGISTICS.COM*
*TOTAL QUALITY LOGISTICS IS AVAILABLE 24 HOURS, 7 DAYS A WEEK, 365 DAYS A YEAR.*
This fax was sent with GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

From: 719 384 8468     Page: 4/9     Date: 10/31/2006 3:34:48 PM

*Rev 02/07/06*                                                                 *10/25/2006  OH CARRIER PACKET 6--*

4. **COMPENSATION.**   CARRIER agrees to transport freight for BROKER, under the terms of its carrier authority, at a rate mutually agreed upon in writing, by fax, or by electronic means, contained in BROKER's Load Confirmation Sheet(s). Additionally, any rates, which may be verbally agreed upon, shall be deemed confirmed in writing where CARRIER has billed the agreed rate and BROKER has paid it. Rates or charges, including but not limited to stop-offs, detention, loading or unloading, fuel surcharges, or other accessorial charges, released rates or values, or tariff rules or circulars, shall only be valid when specifically agreed to in a signed writing by the Parties. CARRIER shall submit invoices, bills of lading and signed loading or delivery receipts for all transportation services furnished under this Agreement to BROKER. CARRIER agrees that BROKER is the sole party responsible for payment of CARRIER invoices and that, under no circumstance, will CARRIER seek payment from the shipper or consignee. BROKER and CARRIER shall use their best efforts to ensure the accuracy of all freight charge billings tendered by BROKER to CUSTOMERS for transportation services performed by CARRIER under this Agreement. BROKER shall have the right to audit, from time to time, any and all freight charge billings by CARRIER, and CARRIER shall cooperate fully with the conduct of such audits. Except in case of *Force Majeure*, CARRIER will be responsible for any additional costs incurred upon BROKER when replacement services are required.

5. **DOT SAFETY RATING.**   At all times during the term of this Agreement, CARRIER shall maintain a "Satisfactory" DOT safety rating. Any change in CARRIER's safety rating other than "Satisfactory" shall be grounds for BROKER to immediately terminate this Agreement on one day's notice to CARRIER.

6. **INSURANCE.**   CARRIER shall obtain and maintain in effect during the term of this Agreement at least the following types and amounts of insurance coverage from reliable insurance companies having a Best rating of A-VII or better. All such insurance shall be written and be required to respond and pay prior to any other available coverage:

   (a)   **Cargo Insurance** insuring CARRIER, BROKER and CUSTOMERS against liability for loss of or damage to freight while in the custody, possession or control of CARRIER, with liability limits of not less than $250,000.00 for each truckload;
   (b)   **Comprehensive General Liability Insurance** (including blanket contractual liability, broad form property damage liability, and extended bodily injury coverage) insuring CARRIER, BROKER and BROKER's CUSTOMERS against liability for injuries to persons, including injuries resulting in death, and loss or destruction of or physical damage to property, including any other equipment furnished by CUSTOMER for or in connection with services under this Agreement, with combined single limits of not less than $1,000,000.00 per occurrence;
   (c)   **Workers' Compensation Insurance** coverage, as statutorily required; and
   (d)   **Any Other Insurance** required by DOT or any other government agency whose rules and regulations may apply to CARRIER's performance of the terms of this Agreement.

   CARRIER shall furnish BROKER with a certificate of insurance, in a form satisfactory to BROKER, to prove that each of the coverages specified in this paragraph is in effect and is being properly maintained and that neither BROKER nor its CUSTOMERS are obligated to pay premiums for any such insurance. Such certificate of insurance shall reflect that all liability policies name BROKER as certificate holder, and if requested by BROKER, BROKER and BROKER's CUSTOMER as additional insureds. In addition such policies shall provide BROKER with at least 30 days advance notice prior to cancellation, material change or non-renewal.

   CARRIER shall pay all deductible amounts under the foregoing policies. Upon request by BROKER or any CUSTOMER of BROKER, CARRIER shall provide an actual copy of the policies currently in effect along with any exclusions, exemptions, or riders that are not depicted in the governing certificate of insurance.

7. **HAZMAT.**   If BROKER requests CARRIER to transport any shipment required to be placarded under the Department of Transportation (DOT) rules as a hazardous material, the additional provisions in Appendix A, including additional insurance requirements, shall apply for each such shipment.

8. **CARGO LIABILITY AND CLAIMS.**   CARRIER shall issue a bill of lading in compliance with 49 U.S.C. § 80101 et seq., 49 C.F.R. § 373.101 (and any amendments thereto), for the property it receives for transportation under this Agreement. Unless otherwise agreed in writing, CARRIER shall become fully responsible/liable for the freight when it takes/receives possession thereof, and the trailer(s) is loaded, regardless of whether a bill of lading has been issued, and/or signed, and/or delivered to CARRIER,, and which responsibility/liability shall continue until delivery of the shipment to the consignee and the consignee signs the bill of lading or delivery receipt. Any terms of the bill of lading (including but not limited to payment terms) inconsistent with the terms of this Agreement shall be controlled by the terms of this Agreement. Failure to issue a bill of lading, or sign a bill of lading acknowledging receipt of the cargo, by CARRIER, shall not affect liability of CARRIER. Under no circumstances shall CARRIER execute any bill of lading or any other document which represents or holds out BROKER as the person responsible for delivery of any freight.

If a consignee refuses a shipment, or CARRIER is unable to deliver it for any reason, CARRIER's liability as a warehouseman shall



CONTRACT PAGE 2

ELECTRONICALLY FILED 02/03/2017 12:18  /  IFIJ  /  A 1700674  /  CONFIRMATION NUMBER 596100

From: 719 384 8468    Page: 5/9    Date: 10/31/2008 3:34:48 PM

*Rev 02/07/06*        *10/23/2006 OH CARRIER PACKET 7–*

not-begin until CARRIER has provided 24 hour prior written notification of request for directions, and if no other directions are received, either has placed the shipment in a BROKER approved public warehouse, or in CARRIER's terminal or storage facility under reasonable security.

CARRIER shall comply with 49 C.F.R. § 370.1 et seq. and any amendments and/or any other applicable regulations adopted by the Federal Motor Carrier Safety Administration, U.S. Department of Transportation, or any applicable state regulatory agency, for processing all loss and damage claims and salvage.

All liability standards, time limitations and burdens of proof regardless of whether the CARRIER has common or contract authority shall be governed by the common law applicable to common carriers and by 49 U.S.C. § 14706 (the Carmack Amendment), subject to a maximum liability of $250,000.00 per truckload. BROKER reserves the right to offset any claim(s) with pending invoices.

Notwithstanding the terms of 49 C.F.R. 370.9, CARRIER shall pay, decline or make settlement offer in writing on all cargo loss or damage claims within 30 days of receipt of the claim. Failure or CARRIER to pay, decline or offer settlement within this 30 day period shall be deemed admission by CARRIER of full liability for the amount claimed and a material breach of this Agreement.

9. **INDEPENDENT CONTRACTORS.** The relationship between BROKER and CARRIER shall, at all times, be that of independent contractors. CARRIER and any of its approved carriers or agents shall employ, pay, supervise, direct, discipline, discharge and assume full responsibility for all persons required for the performance of CARRIER's duties under this Agreement. Under no circumstances shall CARRIER or any of its approved carriers, agents or employees deemed to be or hold themselves out as employees of BROKER or any CUSTOMER.

10. **INDEMNIFICATION.** CARRIER agrees to indemnify, hold harmless and defend BROKER and its CUSTOMERS from and against any and all claims for loss, damage or injury (including but not limited to reasonable attorney's fees), from and against any lawsuits, actions, and administrative or legal proceedings brought against BROKER or its CUSTOMERS for or on account of any loss or damage to the tangible property of BROKER, BROKER's CUSTOMERS or other persons, or for or on account of any injury received or sustained by any person, including but not limited to employees of CARRIER or its prior written approved carriers, employees and agents of CUSTOMERS, caused by or arising out of the performance of CARRIER, its employees or approved carriers.

11. **BROKER'S ACCOUNTS.** CARRIER agrees to treat all BROKER's CUSTOMERS as BROKER's accounts during the term of this Agreement. If this Agreement is terminated for any reason whatsoever, CARRIER agrees not to solicit freight or provide transportation services to any of BROKER's CUSTOMERS for a period of 18 months after the termination date of this Agreement. If CARRIER does solicit freight or provide transportation services for any of BROKER's CUSTOMERS in violation of this paragraph, then BROKER shall be entitled to collect 10% of the gross compensation received by CARRIER from any and all such CUSTOMERS on all shipments that CARRIER transports for any such CUSTOMER(S) during the 18 month period following the date of termination.

12. **CO-BROKERING.** CARRIER agrees not to re-broker, assign or interline the shipments hereunder tendered to CARRIER by BROKER without the advance written authorization of BROKER. Violation of this policy shall be grounds for immediate termination of this Agreement. If BROKER becomes aware of such co-brokering activity by CARRIER prior to payment of any compensation otherwise due CARRIER, BROKER shall withhold payment to CARRIER and shall instead pay appropriate compensation to the carrier who actually transported the shipment. BROKER will deem any acceptance of a shipment by CARRIER as a common or contract carrier and subsequent subcontracting of the shipment to any third party as an assignment of the right to be compensated for that shipment to the third party. Upon BROKER's payment to delivering carrier, CARRIER shall not be released from any liability to BROKER under this Agreement. CARRIER will be liable for consequential damages (including but not limited to reasonable attorney fees) for violation of this Paragraph.

13. **WAIVER AND DISCHARGE.** The failure of either Party to enforce any provision of this Agreement shall in no way be construed as a waiver of such provision or the right of either Party to enforce such provision in the future or in any way to affect the validity of this Agreement or any part hereof.

14. **NOTICES.** All notices required or permitted under this Agreement shall be in writing, shall be signed by or on behalf of the Party giving the notice, and shall be sent to the other Party at its main office listed above via certified U.S. Mail, overnight courier with delivery receipt, facsimile with machine printed proof of delivery.

15. **GOVERNING LAW.** Unless preempted by or controlled by Federal Transportation Laws and Regulations this Agreement shall be governed by and construed in accordance with the laws of the State of Ohio. CARRIER and BROKER further agree that the



CONTRACT PAGE 3

*WWW.TOTALQUALITYLOGISTICS.COM*
*TOTAL QUALITY LOGISTICS IS AVAILABLE 24 HOURS, 7 DAYS A WEEK, 365 DAYS A YEAR.*
This fax was sent with GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

*Rev 01/07/06*                                                                          *10/23/2006 OH CARRIER PACKET 8-*

exclusive venue for any lawsuit necessary to resolve a dispute not resolved pursuant to paragraph 16 below shall be in state or federal court in Cincinnati, Hamilton County, Ohio.

16. **DISPUTE RESOLUTION.** If a dispute arises between the Parties under this Agreement, as a condition precedent to any other remedy, the Parties agree to:
    (a)    Meet and confer with each other as soon as possible to reach a voluntary resolution of the dispute.
    (b)    If such voluntary resolution does not succeed, the Parties agree to submit the dispute to arbitration before a mutually agreed upon arbitrator.
    (c)    For disputes whose amount in controversy is $10,000.00 or less, the arbitrator's decision shall be final and binding upon both Parties.
    (d)    For disputes whose amount in controversy exceeds $10,000.00 the Parties will seek litigation.

Each Party shall bear its own costs and fees in connection with any above described dispute resolution effort. If the process described in this paragraph fails to resolve any dispute between the Parties, and litigation results, CARRIER agrees to pay all reasonable expenses, attorney fees and costs (including court costs) that BROKER incurs in any such litigation.

17. **ENTIRE AGREEMENT.** This Agreement and its Appendices constitute the entire agreement between the Parties. The Parties further intend that this Agreement constitutes the complete and exclusive statement of its terms, and that no extrinsic evidence may be introduced to reform this Agreement in any judicial or arbitration proceeding involving this Agreement.

18. **INVALIDITY OF PROVISIONS.** If a court of competent jurisdiction declares any provision of this Agreement invalid, such decision shall not affect the validity of any remaining provisions, and all remaining provisions of this Agreement shall remain in full force and effect.

19. **ASSIGNMENT AND DELEGATION.** This Agreement shall inure to the benefit of and be binding upon the successors and assigns of both Parties, provided, however, that no assignment of rights and no delegation of duties under this Agreement shall be effective without the prior written consent of the other Party. Notwithstanding the above, either Party may, at any time, transfer this Agreement together with its rights and duties to any parent corporation or wholly owned subsidiary of its parent corporation, without permission of the other Party.

20. **FACTORING.** Carrier shall provide BROKER written notice of any assignment, factoring, or other transfer of its right to receive payments arising under this Contract at least thirty (30) days prior to such assignment, factoring, or other transfer taking legal effect as to BROKER's payment obligation hereunder (BROKER shall not be obligated to honor any factoring, assignment or any other transfer of CARRIER's right to receive any payments hereunder unless such notice is timely received). Such written notice shall include the name and address of factoring company, assignee/transferee, date, date assignment is to begin, and terms of the assignment, and shall be considered delivered upon receipt of such written notice by BROKER. BROKER shall have the right to ask for and Carrier shall be obligated to furnish any further documentation BROKER requires in order to satisfy itself as to the authenticity of, and payment requirements of the factoring arrangement(s). BROKER's payment obligations hereunder shall not be subject to more than one factoring/assignment agreement at any one time. No multiple assignments, factoring or other such transfers by the CARRIER shall be binding on BROKER. CARRIER shall indemnify BROKER against and hold BROKER harmless from any and all lawsuits, claims, actions, damages (including reasonable attorneys fees, obligation, liabilities, and liens) arising or imposed on BROKER in connection with the factoring/assignment or transfer of any account or right arising thereunder. If CARRIER wants to terminate factoring, a release from the CARRIER and the factoring company in a form satisfactory to BROKER's counsel must be received by BROKER specifying the terms and date of release. CARRIER also releases and waives any right, claim or action against BROKER for any amount due and owing under this Agreement where CARRIER has not complied with the notice requirements of this section.

21. **ELECTRONIC AND FAX COMMUNICATIONS.** During the term of this Agreement, the parties anticipate that they will exchange materials and information in electronic form (collectively "Electronic Materials"), either through the other party's websites, e-mail or other electronic means (collectively "Electronic Connections") and via fax. By providing their fax numbers and signing this Agreement, each party consents to receiving communications via fax regarding all aspects of their relationship. Under no circumstances will BROKER or its affiliates be responsible for, and CARRIER hereby expressly waives and releases BROKER and its affiliates from, any liability for any loss or damage caused by Computer Viruses, the CARRIER's receipt of Electronic Materials from BROKER or its affiliates or Electronic Connections between BROKER and its affiliates and the CARRIER.

22. **CONFIDENTIALITY.** In addition to Confidential information protected by law, statutory or otherwise, the Parties agree that all of their financial information and that of their customers, including but not limited to freight and brokerage rates, amounts received for brokerage services, amounts of freight charges collected, amounts of freight charges paid, freight volume requirements, as well as



CONTRACT PAGE 4

*WWW.TOTALQUALITYLOGISTICS.COM*
*TOTAL QUALITY LOGISTICS IS AVAILABLE 24 HOURS, 7 DAYS A WEEK, 365 DAYS A YEAR.*
This fax was sent with GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

From: 719 384 8468    Page: 7/9    Date: 10/31/2006 3:34:49 PM

*Rev 09/07/06*                                                                                              *10/23/2006  OH CARRIER PACKET 9-*

personal customer information, customer shipping or other logistics requirements shared or learned between the Parties and their customers, shall be treated as Confidential, and shall not be disclosed or used for any reason without prior written consent. In the event of violation of this Confidentiality paragraph, the Parties and agree that the remedy at law, including monetary damages, may be inadequate and that the Parties shall be entitled, in addition to any other remedy they may have, to an injunction restraining the violating Party from further violation of this Agreement in which case the prevailing Party shall be liable for all costs and expenses incurred, including but not limited to reasonable attorney's fees.

## CARRIER REQUIREMENTS

### GENERAL CARRIER REQUIREMENTS

1. Drivers are required to check call every day (including Saturday, Sunday, and holidays) between 8:00am and 9:00 am Eastern Time giving their current location and temperature if required. Failure to do so can result in a $100.00 fine against the CARRIER's settlement for each infraction.
2. BROKER is available 24 hours a day 7 days a week. Failure to call immediately on any problems can result in a $200.00 fine to CARRIER.
3. Failure to report any overage, shortage, or damage within 24 hours will result in a $100.00 fine to CARRIER.
4. CARRIER is responsible for any damage to product or damage to the products container, and shortages of freight.
5. If any unloading payment is agreed upon, carrier must supply unloading receipt with lumper's full name and social security number along with the BROKER authorization number at the time of original billing. Failure to do so within 24 hours of delivery will result in no reimbursement for unloading.
6. For all pallet exchange loads be sure that the number of pallets in and number of pallets out are marked clearly on the original Bill of Lading.
7. Failure to deliver with fully loaded trailer or incomplete order will result in a reduced pro-rated fee.
8. Any costs incurred by BROKER due to CARRIER being late for pick-up or delivery appointments may be charged to the CARRIER.
9. Any product which must be disposed must have prior written consent from BROKER before being disposed.
10. Before loading driver must have a sufficient number of load locks to secure the load.
11. Loads that are sealed at the shipping point are to remain sealed until an authorized person at the receiver breaks the seal. If the seal is broken by an unauthorized person, the CARRIER becomes 100% liable for the invoice value to customer or cost whichever is greater, of the product and any other expenses.

### CARRIER REQUIREMENTS FOR REFRIGERATED LOADS
*(These requirements are additions to the General Carrier Requirements listed above)*

1. Prior to loading, confirm that the reefer unit is working properly and pre-cool trailer to required temperature.
2. Trailers hauling produce must have an air chute for proper circulation, no exceptions! It is the driver's responsibility to make sure the chute is not damaged, obstructed or blocked in any way.
3. Driver is responsible to make sure space is provided for air circulation in front, rear, top, bottom and between the load.
4. Check pulp temperature of the product to ensure that it has been pre-cooled. Do not accept any fresh product pulping over 2 degrees above the required temperature noted on BROKER rate confirmation. If the temperature on BROKER rate confirmation differs from that on the Bill of Lading, call BROKER before signing the bills of lading at the shipper. If the load is accepted contrary to the terms on BROKER rate confirmation, CARRIER accepts all risk or resulting loss. Make sure the pulp temperature of the product loaded is marked on the original Bill of Lading and that the driver agrees with that temperature.
5. When driver signs the Bill of Lading, he/she is confirming that he/she received the correct product and correct count at the proper temperature. Be sure they agree with the information on the Bill of Lading. Your company is responsible.
6. Maintain continuous temperature noted on our Rate Confirmation in-route, unless otherwise instructed by our office. If you do not, you assume all risk of loss resulting.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written intending to be legally bound.

BROKER:  **TOTAL QUALITY LOGISTICS, INC.**
             **TOTAL QUALITY LOGISTICS, LLC.**

Name:  Jim Perkinson

Signature:  *James C Perkinson*

Title:  **Logistics Development Supervisor**

CARRIER:  *Cornelius Leasing Systems Inc.*

Name:  *R. G. Cornelius*

Signature:  *RGlull*

Title:  *Pres*

CONTRACT PAGE 5

*WWW.TOTALQUALITYLOGISTICS.COM*
*TOTAL QUALITY LOGISTICS IS AVAILABLE 24 HOURS, 7 DAYS A WEEK, 365 DAYS A YEAR.*
This fax was sent with GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

From: 719 384 8468     Page: 8/9     Date: 10/31/2006 3:34:50 PM

Rev 08/07/06                                                      10/23/2006  OII CARRIER PACKET 3_

## Payment Terms



PAYMENT TERMS

> Please indicate which of the following payment terms you would like to be set up with. Your selection will remain as your permanent payment term until we (TQL) are notified in writing that you would like your term changed. If this form is not filled out, signed and returned your payment terms will default to 28 DAYS.

**All pay terms are calculated from the day TQL receives the paperwork**

__X__ 28 Days – no fees – check mailed within 28 days of TQL receiving the paperwork.

_____ 3% 7 Day – 3% service charge will be deducted from the gross truck rate. A check will be issued within 7 days of TQL receiving the paperwork. This will be my regular payment term.

We also offer a 5% Next Day payment option – 5% service charge will be deducted from the gross truck rate, plus a $25.00 processing fee per load. You will receive a Comcheck one business day after TQL receives the paperwork. If we receive your paperwork on Friday, you will receive your Comcheck on Monday (QuickPay will not be guaranteed if there are any problems with the load overages, shortages, late delivery, temperature issues, etc.). You can select 5% Next Day on a per invoice basis if you have selected either 28 Day or 3% 7 Day. To use this option 5% Next Day must be marked clearly on both your envelope and invoice.

_____ I would like 5% Next Day to be my regular payment term. To use this option you will still need to mark 5% Next Day clearly on both your envelope and invoice.

> All paperwork submitted must include:
> - Invoice with your company name and address with your payment terms clearly indicated.
>   (The TQL Rate Confirmation can be used as your invoice as long as you mark your invoice number in the provided space)
> - Original B.O.L./P.O.D. signed by the receiver.
> - Any unloading or pallet receipts with TQL authorization number printed on them.
> - Copy of the TQL Rate Confirmation.

## Comcheck Authorization

COMCHECK AUTHORIZATION

> Comchecks are available only after freight has been loaded. If this form is not completed TQL will not be able to issue comchecks. Yes or No must be selected for each item listed below.
>
> Comchecks can be issued to drivers (maximum allowed is 40%, limit $1,400)                    Yes___ No_X_
>
> Comchecks can be issued to dispatchers (maximum allowed is 40%, limit $1,400)            Yes___ No_X_
>
> Comchecks are to be issued ONLY FOR UNLOADING                                                            Yes_X_ No___
> **Unloading will be reimbursed with a valid unloading receipt, see carrier contract**
>
> Comchecks are NEVER to be issued to either drivers or dispatchers                                    Yes___

***TQL After Hours and Weekend Comcheck Procedure***

TQL after hours personnel can only issue a Comcheck upon confirmation from the shipper that the truck has been loaded. In the event that we are unable to reach a shipper, we may request a fax copy of the Bills of Lading before issuing the Comcheck. Furthermore, to ensure that we are giving the Comcheck to the correct carrier, it is imperative that all drivers be able to recite their company's MC number. TQL after hours personnel can not issue an advance for more than 40% of the total rate to the truck up to a $1400.00 maximum advance. This policy will be in effect after 5pm every weekday and throughout each weekend.

*WWW.TOTALQUALITYLOGISTICS.COM*
*TOTAL QUALITY LOGISTICS IS AVAILABLE 24 HOURS, 7 DAYS A WEEK, 365 DAYS A YEAR.*
This fax was sent with GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

From: 719 384 8468 ___   Page: 9/9    Date: 10/31/2006 3:34:50 PM

Rev 09/07/06                                                    10/23/2006  OH CARRIER PACKET 4—

# FORM W-9



W-9

TQL's Form W-9 is used to determine whether or not TQL should file Form 1099-MISC annually for a specific payee. The Internal Revenue Service requires TQL to supply our payees with either the standard federal W-9 form or our substitute W-9 form to hold in the payee's file. Please complete TQL's substitute Form W-9 and return it with your contract carrier approval paperwork. Should you have any questions, please feel free to contact us at 800-580-3101; Ext. 2510.

**Please be sure to supply your "Doing Business As" information, if applicable. Your DBA is important information for proper tax reporting.**

| CORPORATIONS - PLEASE CHECK: INC. ( )   CORP. ( )   LLC ( ) |
|---|
| Corporation Name _Greenline Leasing Systems, INC._ |
| Doing Business As (*If applicable)_____ |
| State of Incorporation __CO__   Federal Tax ID# ▆▆▆▆▆▆▆ |

| INDIVIDUALS, SOLE PROPRIETORS, PARTNERSHIPS |
|---|
| Company or Individual Name_____ |
| Doing Business As (*If applicable)_____ |
| Federal Tax ID #_____ |
| Social Security #_____ |

Name: _____
Title: _____
Address: _____
City: _____ State: ___ Zip: _____

## CERTIFICATION

*Under penalties of perjury, I certify that: (1) the number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me) ; and, (2) I am not subject to backup withholding because (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding.*

Signature _____     Date __10/24/06__

WWW.TOTALQUALITYLOGISTICS.COM
*TOTAL QUALITY LOGISTICS IS AVAILABLE 24 HOURS, 7 DAYS A WEEK, 365 DAYS A YEAR.*
This fax was sent with GFi FAXmaker fax server. For more information, visit: http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

ELECTRONICALLY FILED 02/03/2017 12:18  /  IFIJ  /  A 1700674  /  CONFIRMATION NUMBER 596100

This document was created with Win2PDF available at http://www.daneprairie.com.
The unregistered version of Win2PDF is for evaluation or non-commercial use only.